UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL JOHNSON,<br><br>    Plaintiff,<br><br>  v.<br><br>E. ARNOLD, et al.,<br><br>    Defendants. | No.  2:17-cv-0344 KJM AC P<br><br>FINDINGS & RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  Currently before the court is defendants' motion for summary judgment.  ECF No. 41.

I. Procedural History

The undersigned screened the complaint and found that plaintiff had stated cognizable claims against defendants Win, Baumert, and Keursten.  ECF No. 13.  The claims against defendants Arnold and Lewis were dismissed with prejudice.  ECF No. 18.  After the close of discovery, defendants filed a motion for summary judgment (ECF No. 41), which plaintiff opposes (ECF No. 47).

II. Plaintiff's Allegations

The complaint alleges that defendants Win, Baumert, and Kuersten were deliberately indifferent to plaintiff's serious medical needs.  ECF No. 1 at 3-4.  In September 2015, plaintiff

saw defendant Win, who was his primary care physician, about an outbreak of sores, large bumps, and rash-like growths on his scalp and his concern that he needed a biopsy because his condition had been misdiagnosed. Id. at 3. Win submitted a request for plaintiff to receive injections, which was denied by defendant Kuersten. Id. In November 2015, plaintiff was seen for his condition by defendant Baumert, a registered nurse, who made a false report that there were no signs or symptoms of infection or drainage from the keloid on the back of plaintiff's head. Id. at 3-4. In November 2016, plaintiff was assigned a new primary care provider who biopsied his scalp, diagnosed a fungus closely related to Valley Fever, and prescribed fluconazole. Id. at 4. As a result of defendants' deliberate indifference and the long delay in treatment, plaintiff will have major scarring and permanent disfigurement of his scalp. Id.

III.     Motion for Summary Judgment

  A.     Defendants' Arguments

Defendants argue that they were not deliberately indifferent to plaintiff's serious medical needs and alternatively that they are entitled to qualified immunity. ECF No. 41-1.

  B.     Plaintiff's Response

At the outset, the court notes that plaintiff has failed to comply with Federal Rule of Civil Procedure 56(c)(1)(A), which requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Plaintiff has also failed to file a separate document in response to defendants' statement of undisputed facts that identifies which facts are admitted and which are disputed, as required by Local Rule 260(b).

"Pro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). However, it is well-established that district courts are to "construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). The unrepresented prisoner's choice to proceed without counsel "is less than voluntary" and they are subject to "the handicaps . . . detention necessarily imposes

upon a litigant," such as "limited access to legal materials" as well as "sources of proof." Jacobsen v. Filler, 790 F.2d 1362, 1364 n.4 (9th Cir. 1986) (alteration in original) (citations and internal quotation marks omitted). Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to the requirements of the summary judgment rule. Id. (citation omitted).

Accordingly, the court considers the record before it in its entirety despite plaintiff's failure to be in strict compliance with the applicable rules. However, only those assertions in the opposition which have evidentiary support in the record will be considered.

Plaintiff argues that defendants were deliberately indifferent because they refused to biopsy his scalp to determine the cause of his condition and instead continued to prescribe treatments that had already failed to cure the problem. ECF No. 47 at 1-14. He also argues that defendants are not entitled to qualified immunity. Id. at 14-16.

### IV. Legal Standards for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the

4

opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

Defendants simultaneously served plaintiff with notice of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure along with their motion for summary judgment. ECF No. 41-2; see Klingele v. Eikenberry, 849 F.2d 409, 411 (9th Cir. 1988) (pro se prisoners must be provided with notice of the requirements for summary judgment); Rand v. Rowland, 154 F.3d 952, 960 (9th Cir. 1998) (en banc) (movant may provide notice).

V.  Legal Standard for Deliberate Indifference to a Serious Medical Need

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Id. (some internal quotation marks omitted) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

Deliberate indifference is a very strict standard. It is "more than mere negligence." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Even civil recklessness—failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known"—is insufficient to establish an Eighth Amendment claim. Id. at 836-37 (citation omitted). A prison official will be found liable under the Eighth Amendment when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A plaintiff can establish deliberate

indifference "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citing McGuckin, 974 F.2d at 1060).

A difference of opinion between inmate and prison medical personnel—or between medical professionals—regarding the appropriate course of treatment does not by itself amount to deliberate indifference to serious medical needs. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To establish that a difference of opinion rises to the level of deliberate indifference, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted).

### VI. Undisputed Material Facts

Plaintiff did not separately respond to Defendants' Statement of Undisputed Facts (DSUF), and the facts are therefore deemed undisputed except as otherwise discussed. Additional facts have been taken from plaintiff's medical records, the authenticity and accuracy of which are not in dispute.

At all times relevant to the complaint, plaintiff was a prisoner in the custody of the California Department of Corrections and Rehabilitation and housed at California State Prison (CSP)-Solano. DSUF (ECF No. 41-3) ¶ 1. Defendants Win, Kuersten, and Baumert were employed at CSP-Solano as a physician, Chief Medical Executive (CME), and registered nurse, respectively.

In 2012, while housed at the Correctional Training Facility, plaintiff complained of sores on the back of his scalp that he stated began in 2010. DSUF ¶ 3. Plaintiff was treated for several months and was referred to an outside dermatologist after the treatments failed. DSUF ¶ 4. On October 3, 2012, plaintiff was seen by Dr. Luu, a board-certified dermatologist, who diagnosed plaintiff's condition as acne keloidalis nuchae.[1] DSUF ¶ 5. Dr. Luu treated plaintiff with liquid nitrogen and a Kenolog injection. Id. The injections could be repeated every two months, and

---

[1] DSUF ¶ 5 states that Dr. Luu notes scarring. However, this claim is not supported by the record cited. See ECF No. 41-3 at 32.

plaintiff received additional injections on May 8 and June 12, 2013. DSUF ¶¶ 6-7. A progress note from June 12, 2013, reflects that the lesion was "reduced significantly." ECF No. 47 at 49. A progress note from July 11, 2013, stated that the lesions "appear to be responsive to the steroid injections which have improved but not completely resolved the lesions" but that they would be discontinued at plaintiff's request due to his concerns about fainting during the last injection. Id. at 50.

Between February and August 2014, plaintiff submitted sick-call slips claiming that the rash on his head was getting worse and spreading. DSUF ¶ 9. He was continued on medications that included hydrocortisone cream to alleviate the itching. DSUF ¶ 10.

On October 8, 2014, plaintiff was transferred to CSP-Solano. DSUF ¶ 11. Upon arriving at the prison, plaintiff was assessed by a doctor[2] who noted he had a history of chronic scalp dermatitis. DSUF ¶ 12. On October 28, 2014, plaintiff submitted a healthcare request stating that he had an outbreak of bumps and sores on his scalp that were very tender and itchy. ECF No. 47 at 93. He was seen by a nurse on October 31, 2014, who recorded that he had a small acne keloidalis nuchae with no infection noted. Id. at 94. Plaintiff was advised that his scalp was without sores or signs of infection at the time of the exam and that he had a follow up with a doctor pending. Id. at 95. He was also directed to continue using selenium sulfide. Id. On November 4, 2014, plaintiff was examined by Win for the first time. DSUF ¶ 14. Win checked plaintiff's scalp, noting that "he has keloid lesion on the occiput area and lesion is not infected." Id. Win re-ordered hydrocortisone cream 1% for plaintiff's scalp.[3] DSUF ¶ 13. Plaintiff was also prescribed selenium sulfide 2.5% lotion to be applied to his scalp twice a week.[4] DSUF ¶ 14.

---

[2] Defendants' statement of facts states that plaintiff was examined by a "Dr. Vuestra." DSUF ¶ 12. However, the signature appears to be that of defendant Kuersten. See ECF No. 41-3 at 37 (new arrival progress note), 153 (denial of Kenalog injections).

[3] The exhibit pages cited in defendants' statement of facts do not support this statement. See ECF No. 41-3 at 136-38. However, plaintiff does not dispute this fact and the medication records indicate that Win prescribed plaintiff 1% hydrocortisone cream on November 4, 2014. See id. at 220.

[4] Although defendants' statement of facts state that Win prescribed the selenium sulfide lotion at the appointment, the record cited reflects that the lotion was prescribed by a physician assistant on October 17, 2014. ECF No. 41-3 at 222. However, plaintiff does not dispute that he was prescribed the lotion, and the discrepancy is ultimately immaterial since the records indicate that

On February 9, 2015, plaintiff complained that he had a rash-like outbreak on the back of his scalp that was "painful, uncomfortable and is constantly bleeding and producing yellow like fluid from these bumps/sores." ECF No. 41-3 at 89. He was seen by a nurse on February 11, 2015. Id. at 55-56. The nurse recorded that plaintiff reported that his scalp was "sensitive and itchy," hydrocortisone and steroid injections made it better, and he was requesting to be seen by a doctor for further evaluation. Id. It was further noted that plaintiff had large, visible bumps and multiple lesions on his scalp with no active bleeding or discharge. Id. at 56.

On April 5, 2015, plaintiff submitted healthcare requests seeking renewal of his medicated shampoo and to be seen by a doctor for the sores and rash-like bumps on his scalp that were "constantly bleeding and sore." Id. at 82-83. Plaintiff's medication was renewed and he was seen by a nurse on April 7, 2015. Id. at 45-46, 82-83. The nurse recorded that plaintiff reported the sores were "6/10 irritating;" that it was "constantly bleeding, especially after washing [his] hair;" and that hydrocortisone and medicated shampoo helped with the itching. Id. at 45-46. It was further noted that plaintiff had a 4 cm x 2 cm lesion on his occipital lobe and that there was "[n]o evidence of bleeding or oozing, no previous scabbing noted." Id. at 46.

On April 13, 2015, plaintiff was seen by Win for his scalp keloid, at which time he complained that it was causing him pain while sleeping. DSUF ¶ 16. Win submitted a request for plaintiff to be scheduled for Kenalog injections. Id. On April 15, 2015, defendant Kuersten denied the request because the treatment was "[n]ot medically necessary to protect life, prevent significant illness or disability, or alleviate severe pain." ECF No. 41-3 at 153; DSUF ¶ 16.

On May 21, 2015, plaintiff was seen by Win for his scalp keloid and was informed that the request for Kenalog injections was denied. DSUF ¶ 17. Win examined plaintiff's scalp and noted that the keloid was the same as before, without secondary infection or active bleeding, and provided plaintiff with information on keloid management. Id.

On August 3, 2015, plaintiff was seen by Win for his scalp keloid. DSUF ¶ 18. Plaintiff requested a biopsy, antibiotics, and that he be send for injections. ECF No. 41-3 at 110. There

---

plaintiff's prescription was active at the time he was seen by Win.

8

was no sign of secondary infection and Win advised plaintiff that antibiotics were not needed, the clinical diagnosis was keloids, a biopsy was not indicated or needed at that time, and that plaintiff had already been informed that the request for injections had been denied in April. Id.

On August 31, 2015, plaintiff submitted a healthcare request regarding his scalp and stated that his condition had gotten worse and was bleeding a lot more. Id. at 76. He was seen by a nurse on September 2, 2015, who noted that plaintiff was requesting a biopsy and antibiotics and that there were "no open sores/lesions, no bleeding, drainage on scalp noted." Id. at 44. The note indicates that Win was consulted and stated that there was no need for antibiotics at that time and that plaintiff's medicated shampoo and hydrocortisone would both be renewed. Id. Plaintiff was seen for a follow up with Win on September 11, 2015, at which time Win noted that plaintiff had started medicated shampoo the day before, there were one to two red spots on plaintiff's scalp, and the keloid was dry, without discharge. DSUF ¶ 19; ECF No. 41-3 at 108.

On September 23, 2015, plaintiff filed a grievance claiming that Win had requested he receive Kenalog injections and a biopsy but that Keursten denied the request. DSUF ¶ 26. On November 13, 2015, defendant Baumert interviewed plaintiff regarding the grievance and examined plaintiff's scalp. DSUF ¶ 27. Baumert noted no active bleeding, discharge, or infection (id.), though plaintiff asserts that Baumert lied by stating that there were no signs of infection (ECF No. 47 at 14). Baumert consulted with Win, who advised that a biopsy was not medically indicated at that time. DSUF ¶ 27.

On April 4, 2016, plaintiff submitted a healthcare request stating that his had rash-like bumps all over his scalp that caused him pain and discomfort and that he needed his medication refilled. ECF No. 47 at 73. He was seen by a nurse on April 7, 2016, and reported that nothing made the rash better, it had grown in size, it caused pain when he laid down to sleep, and it bled intermittently. Id. at 75.

On May 12, 2016, plaintiff submitted a healthcare request stating that he needed to be seen for an "outbreak of sores that are bleeding constantly all throughout [his] scalp and causing [him] constant pain and discomfort all day." ECF No. 47 at 70. He was seen by a nurse on May 17, 2016, and the nurse noted that his scalp was dry, intact, and without redness at the time of

9

examination. Id. at 71-72.  On May 27, 2016, he was seen by Win, who noted that during the exam there was no active bleeding or any rashes except for the keloid and that a type of new cream would be ordered because plaintiff stated the cream he was currently using was not effective. Id. at 68.

On June 29, 2016, plaintiff submitted a healthcare request for his scalp stating that he had "bumps and blood & fluid filled sores that are spreading throughout my scalp rapidly," that he was currently without any treatment, and that patches of his hair had been falling out. Id. at 55. He was seen by a nurse on July 1, 2016, who noted that plaintiff had been seen by his primary care provider but the issue was still unresolved and that plaintiff was requesting a biopsy. Id. at 56-57.  He was advised to contact medical immediately if his scalp became infected and had blood or pus. Id. at 57.

On October 30, 2016, plaintiff submitted a healthcare request stating that he needed to be seen because he had constant itching and pain from due to the ongoing, rash-like bumps on his scalp. Id. at 58.  He was seen by a nurse on November 1, 2016, and complained that his scalp was constantly itchy and painful when he laid down, that he had tried different treatments that did not work, and that some medication had worked but he did not know what the name. ECF No. 41-3 at 229.  The nurse observed multiple red, acne-like spots, a small lump, and that the skin was intact with no bleeding or drainage. Id. at 230.

On November 14, 2016, plaintiff was seen for a follow up with Dr. Mo, another physician at CSP-Solano. DSUF ¶ 20.  During the appointment Dr. Mo was unable to find the previous dermatology note or any pathology results. Id.; ECF No. 41-3 at 234.  On examination, Dr. Mo found "a large raised island of scalp tissue which is mostly smooth and devoid of hair," "several smaller islands of raised tissue," "numerous raised small papules," and no discharge. ECF No. 41-3 at 234.  He noted that there was likely a keloid component to the rash, that it was unclear if there was an underlying fungal infection, and ordered a fungal skin scraping. Id.  He also ordered plaintiff selenium lotion for the itching. Id.

On November 23, 2016, plaintiff was seen by Dr. Mo to discuss the results of his scalp culture. Id. at 233.  The culture revealed cryptococcus uniguttulatus, a fungal infection. Id.;

DSUF ¶ 21. Dr. Mo reviewed literature related to the fungus and found that only one other case reported for it being a human pathogen. DSUF ¶ 21. He noted that the culture was still preliminary and could represent a primary skin infection or contaminant and that he was considering a course of oral antifungals. ECF No. 41-3 at 233.

On January 3, 2017, Dr. Mo followed up with plaintiff for his chronic scalp rash. Id. at 232. He noted that cryptococcus uniguttulatus was a fairly rare human pathogen and "very unlikely to be causing systemic infection." Id. Plaintiff complained that his itching had gotten worse after Dr. Mo switched him to triamcinolone cream from the nonformulary ointment. Id. On April 3, 2017, plaintiff had another follow up with Dr. Mo and reported "some mild improvement in his scalp with less bleeding and itching." Id. at 231.

On June 6, 2017, plaintiff was transferred from CSP-Solano, and the rash and scarring to his head has gotten worse. DSUF ¶ 22.

On September 19, 2017, plaintiff saw Dr. Sugarman, a dermatologist, for his scalp condition. Id. at 238. Dr. Sugarman noted that while it was possible that plaintiff had acne keloidalis, it was likely that plaintiff had folliculitis decalvans and that he did not think plaintiff had a "primarily fungal process and most likely the culture revealing Cryptococcus [was] a red herring." Id. He ordered a biopsy of plaintiff's scalp. Id. On November 1, 2017, Dr. Sugarman had a follow up with plaintiff. Id. at 239. The biopsy revealed dermal fibrosis. Id. Dr. Sugarman noted that it "could represent end-stage scarring versus disease that could still have some activity" and recommended Kenalog injections. Id.

On August 5, 2019, plaintiff was seen by Dr. Ely for his scalp condition. Id. at 246. Plaintiff reported to Dr. Ely that he had had two Kenalog injections and that while the thickness of the scarred areas on his scalp had flattened, he continued to have painful pustules on the rest of his scalp. Id. Dr. Ely assessed plaintiff as having folliculitis decalvans with nuchal scarring and recommended Kenalog injections every six weeks along with Nizoral shampoo, doxycycline, and fluconazole. Id. He noted that "[t]his is a very difficult problem and sometimes requires multiple antibiotics given at the same time. Usually fluconazole and diflucan will calm things down." Id.

Plaintiff was seen for a follow up with Dr. Ely on January 6, 2020, where he stated that he

had received the Nizoral shampoo, doxycycline, and fluconazole for two weeks before they were discontinued and he was told he had to see a doctor to get them ordered again. Id. at 248. Dr. Ely noted that plaintiff had "chronic folliculitis which dermatologists call a '20 year disease.' It often takes three or four antibiotics given together for many months to resolve. It is most difficult. It certainly is not coccidioidomycosis." Id. He recommended Nizoral shampoo daily for at least a year and doxycycline and fluconazole for three months or until plaintiff's next visit. Id.

On May 4, 2020, plaintiff had a follow up with Dr. Chao where plaintiff reported "improvement but persistence despite Doxycyline and Fluconazole. Only Fluconazole is on current medication list." Id. at 250. Dr. Chao recommended that plaintiff restart doxycycline, continue fluconazole, and start a daily benzoyl peroxide wash. Id. 251.

Plaintiff's current diagnosis is folliculitis decalvans, which is a rare chronic (long term) inflammatory condition of the scalp that usually leads to scarring. DSUF ¶ 24. The affected area of the scalp becomes red and swollen and may form scaly areas, scabs, and crusts. Id. Pus filled spots may develop, most commonly on the back of the head, but any other part of the scalp can be involved. Id. A characteristic feature is that several hairs ("tufts") exit from the same hair follicle on the scalp skin. Id. This is called "tufting." Id. Bald patches may develop and increase in size, to leave permanent scarring hair loss, or "cicatricial alopecia." Id. The condition is not contagious, and the exact cause is unknown. Id. No cure has been found for folliculitis decalvans, though there are some treatment options, including medicated shampoos, anti-inflammatory and antibacterial scalp solutions and/or oral antibiotics. DSUF ¶ 25. Many of these were provided to plaintiff by defendant Win. Id. Treatment for plaintiff's condition is aimed at reducing inflammation and preventing further scarring. Id.

VII.   Discussion

   A.   Deliberate Indifference

It is perfectly clear that plaintiff suffers from a painful and distressing condition that has not been amenable to treatment and that negatively impacts his life. However, this unfortunate situation cannot provide a basis for recovery under the Civil Rights Act unless the defendants have violated plaintiff's constitutional rights. As set forth above in the recitation of Eighth

Amendment standards, a failure to cure plaintiff's condition or relieve his discomfort does not violate the Eighth Amendment.  Neither does medical malpractice, which the evidence here does not establish.  Plaintiff can defeat summary judgment only if there is enough evidence for a jury to possibly find deliberate indifference to plaintiff's serious medical need, and that evidence is lacking.

The parties are largely in agreement as to the treatment plaintiff received from defendants.  The evidence shows that plaintiff was seen in response to his requests for health care and that defendant Win examined him and prescribed a course of treatment.  Plaintiff's arguments that Win should have known he had a fungal infection and should have sent him for further testing demonstrate negligent misdiagnosis at best, which does not rise to the level of deliberate indifference.  See Wilhelm v. Rotman, 680 F.3d 1113, 1123 (9th Cir. 2012) (negligent misdiagnosis does not establish deliberate indifference).  Plaintiff's arguments that Keursten was deliberately indifferent when he denied plaintiff Kenalog injections and a biopsy also fail.  Plaintiff testified during his deposition and states within his opposition that the Kenalog injections did not work.  ECF No. 41-3 at 271-72; ECF No. 47 at 3-4.  He therefore cannot show that the denial of the injections caused him any harm.  Furthermore, contrary to plaintiff's assertions, Keursten did not deny Win's request to have plaintiff's scalp biopsied.  Plaintiff's medical records reflect that Win never made a request for a biopsy because he felt a biopsy was not medically indicated (ECF No. 41-3 at 44, 110), and there is no evidence that Keursten was involved in that decision.  With respect to Baumert, plaintiff argues that she was deliberately indifferent because she falsely reported that his scalp was not infected on the day she examined him for his grievance.  ECF No. 47 at 14.  However, even if Baumert did lie about the condition of plaintiff's scalp, there is no evidence that she denied him any treatment or that her representation of plaintiff's condition effected his treatment in any way.

Finally, even if the court assumes that defendants knew that plaintiff's diagnosis was incorrect and deliberately chose not to send him for further testing, summary judgment is still appropriate because plaintiff cannot show that the delay in treatment caused him additional injury.  See Shapley v. Nev. Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985)

(delay of surgery did not constitute deliberate indifference unless delay was harmful); Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002) (delaying treatment does not establish deliberate indifference unless plaintiff proves delay led to further injury); Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990) (delay in treatment does not constitute Eighth Amendment violation unless it causes "substantial harm").  Although plaintiff argues that the delay in identifying the fungal infection has caused permanent scarring to his scalp and prolonged pain, this claim is not supported by the evidence.  The evidence shows that plaintiff had been suffering from his scalp condition for approximately four years prior to the first time he saw defendant Win, treatment had been largely ineffective during that time, the fungus plaintiff argues defendants should have identified was not the cause of his scalp condition, his condition is difficult to treat even when properly identified, and he continued to suffer from many of the same issues even after being properly diagnosed.  Furthermore, to the extent plaintiff attempts to argue that summary judgment should be denied based on new allegations that defendant Win failed to prescribe him pain medication (ECF No. 47 at 14), this new allegation is not proper in a motion for summary judgment.  Moreover, plaintiff's medication records show that he was already being prescribed pain medications.  ECF No. 41-3 at 156-219.  There is no evidence that a correct diagnosis by defendants would have changed the outcome or affected plaintiff's pain levels.

For these reasons, defendants' motion for summary judgement should be granted.

### B. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted).  In analyzing a qualified immunity defense, the court must consider the following: (1) whether the alleged facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling Saucier's requirement that the two prongs be decided sequentially).  Since the facts

taken in the light most favorable to plaintiff do not show the violation of a constitutional right, it is not necessary for the court to address defendants' qualified immunity argument.

VIII.   <u>Plain Language Summary of this Order for a Pro Se Litigant</u>

The undisputed evidence shows that defendant Win provided treatment for your scalp condition during the time that he was responsible for your care.  The fact that your diagnosis was incorrect is not enough to support recovery in this lawsuit.  The undisputed evidence also shows that defendant Keursten was not involved in the denial of a biopsy and that the Kenalog injections he denied would not have improved your condition.  There is no evidence that defendant Baumert denied you treatment or that her description of your condition affected your treatment in any way.  There is no evidence that defendants deliberately ignored your medical condition or that the delay in obtaining a correct diagnosis caused your additional injury.  Even though your condition has not responded to treatment and causes you great distress, there is no evidence that would support a finding that any of the defendants violated your Eighth Amendment rights.

IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 41) be GRANTED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 4, 2022

*/s/ Allison Claire*
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE